816 F.2d 753
 259 U.S.App.D.C. 449, 34 Cont.Cas.Fed. (CCH) 75,261
 GEORGE HYMAN CONSTRUCTION COMPANY, Appellant,
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.
GEORGE HYMAN CONSTRUCTION COMPANY
v.
WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al., Appellants.
 Nos. 85-6145, 85-6180.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 25, 1986.
Decided April 21, 1987.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 85-00550).
 Richard J. Webber, Washington, D.C., for appellant/cross-appellee.
 Thomas B. Dorrier, Atty., Washington Metropolitan Area Transit Authority, with whom Sara E. Lister and Robert L. Polk, Attys., Washington Metropolitan Area Transit Authority, Washington, D.C., were on the brief for appellees/cross-appellants.
 Before MIKVA, RUTH B. GINSBURG and SILBERMAN, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 This case arises from a contractual dispute between the George Hyman Construction Co. (Hyman) and the Washington Metropolitan Area Transit Authority (WMATA). Officials of WMATA issued a decision on the controversy pursuant to the contract's "Disputes" clause. Hyman then brought suit in district court to challenge WMATA's decision. On cross-motions for summary judgment, the court denied Hyman's claim for "cost of capital," but granted Hyman's claim for "home office overhead costs." 621 F.Supp. 898. Both parties appealed from the district court's decision. We reject the parties' contentions and affirm the district court in all respects.
 
 I. BACKGROUND
 
 2
 In 1974, WMATA awarded a contract to Hyman for the "finish work" on the Metro's Pentagon Station. The contract provided that WMATA would grant Hyman access to several areas of the site on December 1, 1974 and to the remaining areas of the site on February 1, 1975. The contract further provided that Hyman would complete all work by January 24, 1976.
 
 
 3
 From the beginning of the contract period, WMATA delayed Hyman's performance of the work. WMATA gave Hyman access to one area of the site on December 2, 1974, but barred Hyman from entering other areas until various dates between June 1975 and May 1976. After Hyman had received access to the entire site, a number of events for which WMATA was contractually liable, such as floods and stop-work orders, further disrupted Hyman's work. These delays prevented Hyman from completing the project until April 29, 1977--approximately 460 days after the date prescribed in the contract.
 
 
 4
 In 1978, Hyman submitted to WMATA a claim arising from the delays. Hyman alleged that it had incurred additional costs as a result of the delays and demanded an award covering (1) additional labor costs, (2) additional material costs, (3) additional on-site overhead costs, (4) additional home office overhead costs, (5) a profit based on the additional costs, and (6) the cost of the equity capital that Hyman had used to finance the additional costs. The parties entered into negotiation on the claim, but proved unable to reach agreement. Hyman then invoked the Disputes clause of the contract.
 
 
 5
 The Disputes clause states that WMATA's Contracting Officer will make the initial decision on a contract claim. A party to the contract may appeal this decision to WMATA's Board of Directors, which may appoint a representative to decide the appeal. The Board of Directors, by formal resolution, has designated the United States Army Corps of Engineers Board of Contract Appeals (BCA) to hold evidentiary hearings and issue advisory opinions and has appointed WMATA's General Manager to review these opinions and decide the appeals. Under the Disputes clause, a decision of the General Manager, as the "duly authorized representative" of the Board of Directors, "shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence." The Disputes clause goes on to provide that "[n]othing in this contract ... shall be construed as making final the decisions of the Board of Directors or its representative on a question of law."
 
 
 6
 In 1981, WMATA's Contracting Officer denied Hyman's claim for relief. Hyman appealed this decision, and the BCA took up the claim. The BCA conducted a lengthy evidentiary hearing in January and February of 1982. Several years later, the BCA issued a detailed opinion addressing each aspect of Hyman's claim. See George Hyman Construction Co., 85-1 B.C.A. (CCH) p 17,847 (1985).
 
 
 7
 The BCA found that the contract's "Suspension of Work" clause entitled Hyman to receive almost all of the relief it had requested. The Suspension of Work clause stipulates that "an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by [an] unreasonable suspension, delay, or interruption" of work by WMATA. The BCA proposed denying Hyman's demand for lost profits on the basis of the clause's explicit exclusion. See id. at 89,355. The BCA recommended sustaining all other aspects of Hyman's claim. Two of the BCA's conclusions set the stage for this appeal. First, the BCA found that Hyman had a right to receive home office overhead costs as calculated by the formula established in Eichleay Corp., 60-2 B.C.A. (CCH) p 2688 (1960), aff'd on reconsideration, 61-1 B.C.A. (CCH) p 2894 (1961). See George Hyman Construction Co., 85-1 B.C.A. at 89,353-54. Second, the BCA determined that Hyman was entitled to recover the cost of--i.e., the interest forgone on--the equity capital Hyman had used to finance the costs arising directly from the delays. See id. at 89,355.
 
 
 8
 After reviewing the BCA's opinion, WMATA's General Manager issued her decision. See Item 5 of Record Excerpts (R.E.). The decision adopted most of the BCA's conclusions, but rejected the recommendations concerning home office overhead costs and cost of capital. The General Manager held that Hyman was not entitled to recover home office overhead costs because it had failed to show that the delays had caused it to suffer any additional costs of this kind. See id. at 2-3. The General Manager also rejected use of the Eichleay formula to calculate the exact amount of recovery in cases in which a contractor had shown that some recovery of home office overhead costs was proper. See id. With respect to Hyman's claim for interest, the General Manager held that as an "interstate agency," WMATA was immune from liability for prejudgment interest in the absence of either "a statute specifically authorizing the award of interest against the state or its agencies" or a contract provision prescribing the payment of interest. Id. at 3. The General Manager found no such statute and held that the Suspension of Work clause of the contract did not prescribe the payment of interest in this case because interest on equity capital--unlike interest on borrowed capital--is not a "cost of performance." See id. at 4.
 
 
 9
 Hyman brought suit in district court, challenging the General Manager's refusal to award home office overhead costs and cost of capital. Using the standard of review prescribed in the contract's Disputes clause, the district judge reversed the General Manager's determination regarding home office overhead costs, but affirmed her decision concerning cost of capital. See Item 4 of R.E. In discussing home office overhead costs, the district judge wrote that the "record belies the General Manager's conclusion" that Hyman was not entitled to recover home office overhead costs. Id. at 10. With regard to cost of capital, the district judge adopted in toto the General Manager's rationale. See id. at 15-17.
 
 II. DISCUSSION
 A. Home Office Overhead Costs
 
 10
 We begin by stating the extant law regarding recovery of home office overhead costs following a delay or suspension of a contract. The law proceeds from the premise that only some delays and suspensions impose unavoidable loss related to home office overhead on a contractor. If the delay is such that the contractor can neither reduce home office overhead costs (for example, by firing staff) nor take on new work to absorb these costs, he will inevitably suffer a loss of this kind. But if the delay is such that the contractor can either cut home office overhead costs or assume new work to absorb them, he can (and probably will) avoid any damage. Courts therefore have determined that a contractual delay will not automatically entitle a contractor to recover home office overhead costs. See Massman Construction Co. v. Tennessee Valley Authority, 769 F.2d 1114, 1125 (6th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986); W.G. Cornell Co. v. Ceramic Coating Co., 626 F.2d 990, 994 (D.C.Cir.1980) (per curiam). In order to recover, the contractor must show that he necessarily suffered actual damage because the nature of the delay made it impractical for him either "to undertake the performance of other work," Cornell, 626 F.2d at 994, or "to [cut back on] Home Office personnel or facilities," Eichleay Corp., 61-1 B.C.A. at 15,117. A contractor generally meets this requirement by demonstrating that the delay was sudden and of unpredictable duration. See Capital Electric Co. v. United States, 729 F.2d 743, 745-46 & 746 nn. 4-5 (Fed.Cir.1984); Eichleay Corp., 61-1 B.C.A. at 15,117.
 
 
 11
 When a contractor has shown that he is entitled to recover home office overhead costs resulting from a particular contractual delay, the adjudicator of the contractual dispute must determine the exact amount of those costs. Because most contractors simultaneously engage in a wide variety of projects of different magnitude and duration, all of which contribute to the contractor's aggregate home office overhead, this calculation is no simple task. The Armed Services Board of Contract Appeals in Eichleay Corp. devised a method to make the calculation. The total home office overhead for the contract performance period is multiplied by the ratio of contract billings to total company billings; this calculation results in the amount of home office overhead allocable to the contract. That amount is then divided by the number of days of contract performance; the result is the daily home office overhead rate allocable to the contract. That rate is then multiplied by the number of days of delay; the result is the amount of recovery. Since the Armed Services BCA decided Eichleay Corp., numerous courts have approved the use of this formula to calculate the amount of recovery for home office overhead costs. See, e.g., Capital Electric, 729 F.2d at 746-47; Nebraska Public Power District v. Austin Power, Inc., 773 F.2d 960, 972 (8th Cir.1985); Excavation Construction, Inc. v. WMATA, 624 F.Supp. 582 (D.D.C.1984); Golf Landscaping, Inc. v. Century Construction Co., 696 P.2d 590, 592-93 (Wash.Ct.App.1984); Southern New England Contracting Co. v. State, 345 A.2d 550, 558-59 (Conn.1974).
 
 
 12
 Two aspects of the General Manager's determination regarding home office overhead costs are before us on this appeal. First, we must review the General Manager's determination that no recovery of home office overhead costs was proper because Hyman had failed to demonstrate any loss (unavoidable or otherwise). Second, we must consider the General Manager's refusal to use the Eichleay formula in order to calculate the amount of recovery in cases in which a contractor has shown an unavoidable loss. In addressing these issues, we apply, as did the district court, the contractually prescribed standard of review, which allows a court to reverse determinations of the General Manager when they are arbitrary, capricious, unsupported by substantial evidence, or incorrect as a matter of law.
 
 
 13
 The General Manager's discussion of whether Hyman was entitled to recover any home office overhead costs can be quickly summarized. The discussion focuses not on whether Hyman offered proof of loss, but on whether the BCA considered proof of loss in recommending recovery. The General Manager's decision states that the BCA "simply assume[d]" that the delay entitled Hyman to recover home office overhead costs and that the BCA therefore failed to analyze whether Hyman had demonstrated actual loss. See Item 5 of R.E. at 2. The General Manager's only reference to the record evidence concerning damages appears in a parenthetical that takes up less than two lines. Nonetheless, the decision concludes that "there [was] no showing of impact or damage" and that Hyman accordingly had no right to recover. Id. at 3.
 
 
 14
 We agree with the district court that this determination cannot stand, although we reach this conclusion for somewhat different reasons. The district court found that the General Manager had misread the BCA's opinion. See Item 3 of R.E. at 7-11. According to the court, the BCA had not misconstrued the applicable law; the BCA, the court stated, had "implicit[ly]" found that Hyman could not feasibly have acquired replacement work and therefore must have suffered a loss. See id. at 9 n. 8. We incline toward accepting the district court's reading of the BCA's opinion, but we need not decide the matter. Even if we agreed with the General Manager that the BCA had misunderstood the law, we would find the General Manager's decision unacceptable.
 
 
 15
 As an initial matter, the General Manager's discussion fails to explain adequately her determination that Hyman was not entitled to recover. It is not enough for the General Manager to say that the BCA mistook the law; she must show that under a correct view of the law, either the BCA's factual findings or the facts contained in the larger record support her own result. Cf. Local 310, International Brotherhood of Teamsters v. NLRB, 587 F.2d 1176, 1181 (D.C.Cir.1978) ("[W]hile the Board is free to draw different inferences from the facts found by the ALJ, its inferences 'should also rest upon some findings ... so that we may determine whether the Board's finding is supported by substantial evidence in the record as a whole.' " (citation omitted)); Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970) ("[T]he Commission [must] ma[ke] clear not only its awareness of what the [Hearing] Examiner had concluded, but also its reasons for taking a different course."), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). The General Manager in this case failed to give the requisite explanation. In dwelling on the BCA's legal discussion, the General Manager virtually ignored the evidence contained in the BCA's decision or the larger record relating to the issue of unavoidable loss. A determination of this kind is arbitrary and capricious, and we cannot uphold it.
 
 
 16
 Moreover, the General Manager's determination that Hyman is not eligible to recover home office overhead costs is not supported by substantial evidence in the record. In fact, the record evidence cuts strongly in Hyman's favor: it shows that Hyman could not practicably have reduced home office overhead costs or have acquired replacement work to absorb them. The record contains undisputed evidence indicating that the delays caused by WMATA were sudden, sporadic, and of uncertain duration. See generally George Hyman Construction Co., 85-1 B.C.A. at 89,337-41 (Findings of Fact 8, 10-17) (summarizing record evidence). The record reveals, for example, that WMATA neither notified Hyman in advance of the unavailability of access on the contractually prescribed dates nor accurately indicated to Hyman at any time the dates on which access would become available. See Transcript of Proceedings before the BCA (Tr.) at IV, 30-31, 37-57. The record also shows that Hyman had to suspend its work on numerous occasions because of site conditions that WMATA had failed to discover before the onset of the project and that WMATA then took unpredictable amounts of time to correct. See Tr. at IV, 124-25 (large boulders); II, 6-54 (excess water); I, 107-10 (structural work deficiencies). Courts and boards of contract appeals have recognized that delays of this sudden and indefinite kind generally prevent a contractor from taking measures that will enable it to avoid a loss attributable to home office overhead. See, e.g., Capital Electric, 729 F.2d at 745-46 & 746 nn. 4-5; Eichleay Corp., 61-1 B.C.A. at 15,117. We, too, recognize this principle and hold, in accord with it, that the extant evidence supports Hyman's claim. We therefore agree with the district court that the "record belies the General Manager's conclusion" and affirm the court's determination that Hyman is entitled to recover home office overhead costs.
 
 
 17
 The General Manager's decision also disapproved of the use of the Eichleay formula to calculate the amount of recovery in cases in which a contractor has shown that it is entitled to an award. With no explanation, the General Manager espoused what she called a "hybrid approach," which departs in significant respects from the Eichleay technique. See Item 5 of R.E. at 2-3. WMATA, on appeal, argues that the General Manager's approach is preferable to the Eichleay formula, because the latter often results in a windfall to contractors. In essence, WMATA contends not that the use of the Eichleay formula is improper in this case, but that use of the formula is generally inappropriate in computing contract awards.
 
 
 18
 We reject this contention. Except when parties have contracted specifically to use an alternate formula, courts and boards of contract appeals have applied the Eichleay formula to calculate the exact amount of recovery for home office overhead costs. The Federal Circuit, for example, has mandated the use of the Eichleay formula in all disputes arising out of contracts involving the federal government. See Capital Electric, 729 F.2d at 744-47. Other courts have adopted this approach in construing suspension of work clauses in contracts between a contractor and another governmental entity or a private party. See supra at 7. Especially in light of this large body of precedent, we think the Eichleay formula constitutes the appropriate background rule for determining the amount of money due to a contractor who has shown that a contractual delay caused him to suffer increased home office overhead costs. Given that the contract between WMATA and Hyman failed to set forth any substitute rule, we think the General Manager erred in refusing to use the Eichleay formula.
 
 B. Cost of Capital
 
 19
 As we have noted, WMATA's General Manager held that sovereign immunity barred Hyman's claim for prejudgment interest or "cost of capital," and the district court agreed. In reviewing this legal conclusion, we must determine whether WMATA has sovereign immunity from liability for prejudgment interest absent a waiver and, if so, whether a waiver of that immunity in fact exists. Because both parties urge us to do so, we decide these questions in accordance with the law of Virginia.
 
 
 20
 We hold first that absent a statutory or contractual waiver WMATA has sovereign immunity from liability for prejudgment interest on contractual claims. The state of Virginia itself possesses such immunity in the absence of a waiver. The rule in Virginia long has been "that a claim asserted against the state ... [does not] bear[ ] interest where there is no provision in the statute or authorized agreement creating the liability for the payment of interest." City of Lynchburg v. Amherst County, 115 Va. 600, 80 S.E. 117, 120 (1913); see Railway Express Agency v. Commonwealth, 87 S.E.2d 183, 187-88 (Va.1955). This court has stated that WMATA shares Virginia's sovereign immunity: we wrote in Morris v. Washington Metropolitan Area Transit Authority, 781 F.2d 218, 219 (D.C.Cir.1986) that "WMATA's sovereign immunity exists because the signatories [of the interstate Compact creating WMATA, including Virginia] have successfully conferred their respective sovereign immunities upon it." The rule that applies to the state of Virginia thus also applies to WMATA: the latter, like the former, has sovereign immunity from liability for prejudgment interest absent a waiver of that immunity.
 
 
 21
 Hyman initially contends that the WMATA Compact itself waives the Authority's immunity from awards of prejudgment interest. Hyman points to two particular provisions of the Compact. Section 12 of the Compact states that WMATA can "[s]ue and be sued." Section 80 of the Compact provides that WMATA "shall be liable for its contracts." Hyman notes that under federal law, such provisions, when referring to governmental instrumentalities that engage primarily in commercial activities, waive immunity both from suit and from common incidents thereof (such as awards of prejudgment interest). See Franchise Tax Board v. United States Postal Service, 467 U.S. 512, 520, 104 S.Ct. 2549, 2554, 81 L.Ed.2d 446 (1984); Reconstruction Finance Corp. v. J.G. Menihan Corp., 312 U.S. 81, 84-86, 61 S.Ct. 485, 486-87, 85 L.Ed. 595 (1941); Federal Housing Authority v. Burr, 309 U.S. 242, 244-45, 60 S.Ct. 488, 490-91, 84 L.Ed. 724 (1940). Hyman next points out that several states have adopted this federal rule, applying it to their own commercially oriented instrumentalities. See, e.g., Shapiro v. Kansas Public Employees Retirement System, 532 P.2d 1081, 1084 (Kan.1975). Although unable to point to any Virginia cases accepting the rule, Hyman urges that we follow it in this case and hold that the Compact's provisions waive WMATA's immunity from liability for prejudgment interest. Were we to take this approach, a court could award prejudgment interest to Hyman under Virginia Code Sec. 8.01-382, which gives a court discretion to order any party that is not immune to pay prejudgment interest on a judgment.
 
 
 22
 Virginia law, however, precludes us from taking the path Hyman has marked. The Supreme Court of Appeals of Virginia rejected Hyman's proposed approach in Elizabeth River Tunnel District v. Beecher, 302 Va. 452, 117 S.E.2d 685 (1961). In that case, a plaintiff brought suit against the Tunnel District, a state instrumentality authorized to build a tunnel spanning the Elizabeth River and to operate a bus service on the facility. The Elizabeth River Tunnel District Act, much like the WMATA Compact, provided that the instrumentality could "sue and be sued," "plead and be impleaded," and "contract and be contracted with." See id. at 689. Virginia's highest court held that this language did not constitute a waiver of any sovereign immunity. See id. The court stated that "waiver of immunity cannot be implied from general statutory language or by implication. Statutory language granting consent to suit must be explicitly and expressly announced." Id. We cannot see how the Virginia court could more clearly have signaled its dissent from the federal rule, which encourages the construction of language in statutes creating commercially-oriented governmental instrumentalities as waivers of immunity from suit and common incidents thereof. We therefore reject the claim that under Virginia law the WMATA Compact waives sovereign immunity from liability for prejudgment interest.
 
 
 23
 Hyman also contends that the contract's Suspension of Work clause waives WMATA's immunity from awards of prejudgment interest. As we have noted, the Suspension of Work clause provides that in the event of delays such as those Hyman suffered, "an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit)." Hyman contends that its cost of capital--the interest forgone on the equity capital Hyman used to finance the delay's direct costs--constitutes an increased "cost of performance." According to Hyman, the Suspension of Work clause thus waives WMATA's immunity from payment of this award, and Hyman may recover under the contract.
 
 
 24
 We cannot accept Hyman's contention. Under Virginia law, courts must strictly construe contractual--as well as statutory--waivers of immunity. See Hinchey v. Ogden, 226 Va. 234, 307 S.E.2d 891, 895 (1983) (stating that "[i]n Virginia ... 'waiver is an intentional relinquishment of a known right,' and there can be no waiver of sovereign immunity by implication" (emphasis in original) (citation omitted)); City of Lynchburg, 80 S.E. at 120. The General Manager found that the contractual waiver of immunity in this case extended to claims for the cost of debt capital--i.e., the interest paid on borrowed money--but not to claims for the cost of equity capital. See Item 5 of R.E. at 4. We take no position on the General Manager's conclusion concerning claims for the cost of debt capital because that issue is not before us on this appeal. We agree entirely with the General Manager's conclusion concerning claims for the cost of equity capital. At the time Hyman and WMATA entered into their contract, not a single court or board of contract appeals had allowed recovery of interest forgone on equity capital as a "cost of performance"; several courts had suggested that interest forgone on equity capital did not constitute such a cost, see, e.g., Bell v. United States, 106 Ct.Cl. 189, 404 F.2d 975, 984 (1968). Given this circumstance, and Hyman's failure to prove an understanding to the contrary, we cannot find that WMATA intended the waiver of immunity contained in the Suspension of Work clause to extend to claims for the cost of equity capital. We therefore hold that WMATA's sovereign immunity bars Hyman from recovering the interest forgone on the equity capital used to finance the direct costs of the delays.III. CONCLUSION
 
 
 25
 For the reasons stated, we affirm the district court's decision that Hyman is entitled to recover home office overhead costs as calculated by the Eichleay formula. We affirm as well the district court's decision that Hyman is not entitled to recover the cost of equity capital used to finance the direct costs of the delays.
 
 
 26
 It is so ordered.