**WILLIAMS ENTERPRISES, INC., Plaintiff and Cross–Defendant,**

v.

**STRAIT MANUFACTURING & WELDING, INC., Defendants.**

**STRAIT MANUFACTURING & WELDING, INC., Third Party Plaintiff and Cross–Defendant,**

v.

**The SHERMAN R. SMOOT CO., Third Party Defendant and Cross–Plaintiff.**

Civ. A. No. 86–1226.

United States District Court, District of Columbia.

Jan. 4, 1990.

---

Judd L. Kessler, Porter, Wright, Morris & Arthur, Washington, D.C., for Sherman R. Smoot Corp.

Philip C. Jones, Merrifield, Va., and Washington, D.C., for Williams Enterprises, Inc. and Strait Mfg. & Welding, Inc.

## MEMORANDUM OPINION

. BARRINGTON D. PARKER, Senior District Judge:

## INTRODUCTION

In this proceeding, the Court is faced with disputed claims of three corporate liti-

gants covering payment of delay damages arising from the construction of an addition to a public school building in Washington, D.C. At a bench trial, full consideration was given to the testimony of the various witnesses for the parties, their credibility was carefully assessed, and the numerous documents supporting their testimony were reviewed.

The Court determines that cross-plaintiff The Sherman R. Smoot Co. ("Smoot"), has proved by a preponderance of credible evidence that it should prevail and be awarded damages against Williams Enterprises, Inc. ("Williams") and Strait Manufacturing & Welding, Inc. ("Strait").

Pursuant to Rule 52, Fed.R.Civ.P., the Court enters Findings of Fact and Conclusions of Law as follow.

### FINDINGS OF FACT

#### A.

(1) This negligence and breach of contract action arises from the construction of a new gymnasium and certain modernizations at the Coolidge High School ("Project") in Washington, D.C. ("District"). The prime contract for the Project was between the District and Smoot, an Ohio corporation.

Smoot entered into a subcontract with Strait on December 15, 1983. Strait undertook to fabricate and erect the steel frame for the Project. That subcontract provided that Strait would take reasonable safety precautions. Thereafter Strait engaged Williams to undertake the steel erection on the Project.

(2) On September 25, 1984, a steel tower assembled in the area of the Project, which was almost completed by Williams, collapsed causing 25 tons of steel to fall nearly 50 feet to the ground below. The work on the steel erection was totally interrupted. This accident was highly visible, dramatic; it was featured prominently in reports by the print and electronic media. The damaged steel was removed from the job and replaced. The new refabricated steel was delivered to the Project on December 17, 1984.

(3) This legal action was originally brought in 1986 by Williams a second-tier steel erection subcontractor and a local corporation, against a first-tier subcontractor, Strait, a Pennsylvania corporation. Williams sought certain retention payments alleged to be due and owed by Strait. Williams had been employed to accomplish steel erection by Strait. Strait had responsibility for both fabrication and erection of the structural steel for the Project. In turn, Strait filed a third party complaint against Smoot, the prime contractor. Smoot denied the claim for retention payments. In addition, Smoot filed a counterclaim against both Strait and Williams alleging delay damages.

In its counterclaim, Smoot sued the defendant Strait for breach of contract and negligence and the defendant Williams for negligence. Smoot claimed both delay damages, attorneys' fees, costs, and other expenses from Williams and Strait.

(4) In July 1987, while the litigation was then pending, Williams and Strait entered into an indemnity agreement in which Williams agreed to hold Strait harmless for any responsibility for damages to Smoot arising from Smoot's claims in this action. Williams also assumed full responsibility for defense of this matter both for itself and Strait.

#### B.

(5) The prime contract was the Project awarded to Smoot by the District government in late 1983. That contract included a base bid of $9.4 million for the school gymnasium and established a final completion date of 900 days from the date of notice to proceed. That period was established to permit completion of all work on the Project, including the base bid and certain add-ons.

Smoot was required to prepare a Project schedule for submission to and approval by the District. Data for this schedule were gathered by Smoot's manager, Arthur Durrah. He testified that in the process of schedule preparation, he consulted with subcontractors to verify the timing and du-

ration of sub-elements of the work. This first project schedule, called for a computerized critical path method ("CPM") document, prepared on December 21, 1983, and approved in due course by the District.

(6) The subcontract between Smoot and Strait contained important provisions related to this present dispute. Section 1 of the subcontract incorporated by reference all terms of the prime contract between Smoot and the District, including the scheduling requirements. Section 2 required that Strait furnish all labor, materials, and equipment to erect structural steel, steel joist, and steel deck in strict accordance with specifications. Section 6 provided that Strait prosecute the work in a prompt and diligent manner whenever such work, or any part of it, became available, or at such other time the contractor may direct, so as to promote the general progress of the entire construction, and shall not, by delay or otherwise, interfere with or hinder the work of the contractor or any other subcontractor. Strait agreed to pay to Smoot such damages as Smoot might sustain by reason of any delays.

(7) In the original CPM, Smoot established a projected completion date of October 10, 1985, for the Project. Also indicated in the schedule was the final contract completion date required by the District, June 13, 1986. The CPM also specified a duration for each sub-activity. In the case of structural steel erection, the original CPM provided for a total duration of 40 work days. The CPM was updated periodically. A CPM revision dated September 7, 1984 (reflecting the status of the Project as of August 13, 1984, the date on which steel erection actually began) extended the permitted duration of structural steel erection from 40 work days to 45 work days on the critical path.

### C.

(8) With respect to the September 25, 1984 steel collapse, Smoot presented expert testimony, including impressive investigative reports of the Occupational Safety and Health Administration ("OSHA"), and other reputable and creditable sources. Wholesale violations of industry and government safety standards were indicated. Williams' attorney presented no contrary evidence, and he admitted that his client did not contest that its failure to follow appropriate safety standards caused the collapse.

(9) There is no dispute that the steel erection was on the CPM. The original schedule established for steel erection was 40 work days, expanded to 45 days as of August 13, 1984. According to daily job logs, August 13, 1984 was the day on which Williams mobilized and began steel erection, pursuant to arrangements with Smoot and Strait. Scheduled completion of structural steel as of that date was October 16, 1984.

(10) It is generally accepted that a delay to an item on the critical path of a project will cause an equal delay to the completion of the project. To quantify delay, Smoot presented expert testimony of Barry Brower, of Brower & Associates, who measured the delay by using two alternate methods. First, he examined the Project which scheduled completion of steel erection on October 16, 1984. Actual completion of structural steel, including completion of the setting of roof decking on the building as required by the subcontract, was not achieved until January 30, 1985. This was also the same day on which the first precast concrete panels (the next item on the CPM) began to be erected. The result was a delay on the critical path of the Project of 106 calendar days.

(11) In the alternative method, Brower began with September 25 as the date of the steel collapse and noted that the following period was characterized by three phases. First, from September 26 through October 5, the only work accomplished was clearing of the damaged steel and securing of the work area. Eight work days were lost. The next phase from October 6 to December 17, reflected very low activity and a complete absence of the use of the Project crane used in hoisting steel members. Finally, there was the period from December 18 to January 11, 1985, at which point steel erection had reached approximately the

same point which had been achieved on September 25.

Calculated by either method, the result was a total delay related to the collapse of 106 calendar days. From this period Brower subtracted 23 calendar days attributable to actual progress achieved by Williams on the Project, minor change order work accomplished, and an allowance for the fact that the first precast panels were not ready for erection until November 8.

The Court finds that cross examination of Brower did not reveal significant flaws in his analysis.

### D.

(12) It is obvious that the critical path delay occurred from the date of the collapse until the steel was reerected. Williams did not deny that this did occur, but rather asserted that other events created a "concurrent delay." To avoid confusion, particular care is required in use of the word "concurrent." For example, Williams does not assert that it was delayed by Smoot or any other party in its work in erection of structural steel. Williams began work on August 13, 1984, and continued unimpeded until the day of the collapse. Further, no argument is made that any party interfered with the reerection work; that process was completed on or about January 30, 1985. Thus, this delay was of Williams' making.

(13) Stated otherwise, Williams' defense of "concurrency" was that other events cancelled out the delay resulting from the collapse and therefore absolved Williams of liability. These arguments are affirmative defenses and should be examined closely. Williams' arguments are best analyzed by dividing the project into three distinct periods: (1) pre-collapse issues; (2) the immediate impact period (September 25, 1984 to January 30, 1985); and (3) post-January 30 events. The Court concludes that the arguments are not meritorious.

### 1.

(14) Williams pointed to delays in the approval of shop drawings for structural steel and shop drawings for precast fabrication which occurred in the first months of the Project. Both Williams and Strait argued strenuously that a delay in approval of structural steel shop drawings presented a concurrency with the delay caused by the collapse.

■ The testimony and evidence, however, is to the contrary. Structural steel erection could not begin until shop drawings had been completed and the structural steel had been fabricated. But structural erection began in fact on August 13, 1984. Williams continued unimpeded until the September 25 day of the collapse. Similarly, it is clear that any delays in approval of precast shop drawings had no impact on the beginning or performance of structural steel erection in the period prior to the collapse. Any delays of other parties prior to August 13 could not be charged to defendants. The Court finds that there was no "concurrent" delay in this period.

### 2.

(15) A more likely argument was made by defendants that delay in approval of precast drawings could have caused delay in fabrication of the exterior precast panels which were used to enclose the building. Precast panel erection was the next activity scheduled on the critical path after steel erection. The panels were to be hung from the completed steel superstructure. Williams, through a separate, affiliated company, Marietta Concrete ("Marietta") was responsible for precast erection, which began in fact on January 30, 1985, the same day that the final steel erection work was completed.

■ (16) If defendants could have shown that, notwithstanding the collapse, precast siding would not have been available any earlier than January 30 (the date on which precast erection actually began) that might present a concurrency and undercut Smoot's claim. The evidence presented, however, fails to support such a contention. Delays were clearly experienced in obtaining approvals of precast shop drawings by the District and its Architect, H.L. Walker. Nevertheless, defendants' witness Arthur Durrah testified for Williams that some

drawings had been approved as early as July and full approval was provided by October 12. The precast panels had been fabricated by Marietta and were awaiting erection as of November 7. A large number of panels were fabricated as of November 27. It is important to note that at this point the collapse had already occurred and that there was no possibility of precast erection until the replacement steel was fabricated and erected.

(17) Meanwhile, approval of the drawings was withdrawn by the architect on November 26. However, Durrah, the project manager for Smoot, ordered Marietta to continue production notwithstanding. Marietta apparently produced some 190 panels by December 18 and an additional 171 between December 18 and January 14, 1985. It is clear that any problems with the drawings at this point were of little consequence since production proceeded and no evidence was produced that any panel fabricated was later rejected. On the contrary, the evidence indicates that some 360 panels were produced without interruption in late November, December, and early January with no evidence of special pressure on the fabricator to rush. These facts create a strong inference that Marietta could have begun, not later than November 8, to fabricate precast panels at a rate sufficient to maintain project momentum.

(18) To the extent that Williams' argument on concurrency relates to the process of precast fabrication and to the effect of precast shop drawing delays on project progress, the Court noticed that Williams failed to call as witnesses any officials from Marietta or subpoena its company records. Instead, it presented Mr. Arthur Williams, who in 1984 was a 22 year old engineer in training and in charge of his first precast erection project. He was employed by Williams and testified on its behalf. He was not on-site but rather handled the project from his office in Virginia. Mr. Williams was scarcely in a position to comment authoritatively on conditions at Marietta at the time or on the actual impact, if any, of the precast shop drawing delays. The Court regards his testimony as of minimal value.

(19) The precast drawing issue requires the Court to make inferences based on practical experience and to consider the credibility of witnesses, the actions of the parties on this project, and the correspondence and documents referred to by counsel. Given the magnitude of the disruption caused by the steel collapse, the Court hesitates to reconstruct in retrospect what might have happened had the collapse not occurred.

(20) Given the importance of precast in getting the building enclosed for the winter and its position as the next item on the critical path, the Court finds the evidence considered as a whole indicates that, in the absence of the collapse, precast fabrication would have been begun by Marietta on a continuous basis not later than November 8, and perhaps earlier. Smoot, in estimating the 83 days of delay, had already credited the defendants for the precast issue to take account of the November 8 date.

3.

(21) Williams and Strait then argued that there were additional Project delays after January 30, 1985, and that these negate their responsibility for delay resulting from the collapse. This argument is without merit. Defendants pointed out that while Smoot had originally scheduled Project completion for October 10, 1985, final inspection did not occur until May 8, 1986, and actual acceptance was not achieved until early January 1987. Exhibits admitted into evidence contain observations and criticisms by the District of various items of construction work. Such comments from the owner are normal in any on-going construction, but defendants argue that these problems demonstrate, in effect, that the Project would have been delayed in any event.

(22) This argument ignores an 83 calendar day delay on the critical path. In addition, Smoot's president testified that the impact of the collapse was to cause a loss of momentum which was never recovered. Even without this circumstance, however, the logical inference was that regardless of whatever other delays might have oc-

curred, the Project would have been completed 83 days earlier, but for the collapse. Smoot does not charge defendants with any delay after the steel reerection was complete. Instead, a clearly identified 83 day period, proximately related to the collapse, is found to be defendants' responsibility.

### E.

(23) After carefully considering the parties' testimony and the record concerning the case and after having concluded that 83 calendar days of delay have been demonstrated, the Court turns to the quantification of damages attributable to the defendants Strait and Williams. Smoot's expert, Brower & Associates, and the plaintiff's other witnesses quantify these as follows:

| Items | Cost |
|---|---|
| Extra labor for job security and safety; anchor bolt removal and reinstallation | $ 3,554 |
| Loss of labor productivity due to disrupted site and discontinuity of work | 19,604 |
| Unabsorbed home office overhead (Eichleay formula) | 109,911 |
| Unabsorbed field office overhead | 74,463 |
| Extended equipment cost (Plaintiff estimated these damages at $11,205. Upon review, this Court has awarded the sum of $5,000.) | 5,000 |
| Escalated cost of winter protection | 2,888 |
| Labor escalation | 4,049 |
| Increase of insurance premium | 135,000 |
| Claims of attorneys' fees and expert witness | 138,561 |
| | $493,030 |

(24) **Extra labor for job security and safety; anchor bolt removal and reinstallation**

This claim encompasses costs expended immediately following the accident and includes securing the damaged area, additional security required due to the collapse, removing and replacing the damaged steel, costs for the extended use of equipment and costs for anchor bolt removal and reinstallation.

■ Defendants do not dispute that Smoot is entitled to damages for anchor bolt removal and reinstallation. Indeed, this is the only claim in which recovery is conceded by defendants. It is clear that a claimant under the injunction presented here is not required to prove precisely the amount of damages. However, the claimant must prove a fair and reasonable estimate.[1]

Smoot, however, presented persuasive evidence showing both that additional labor was required due to the collapse and establishing the cost attributable to this added burden. This Court finds that plaintiff has fairly and reasonably proved his loss and accordingly awards $3,554 in damages attributable to the extra labor required due to the collapse.

(25) **Loss of labor productivity**

Smoot argues that as a result of the collapse, its work force became considerably less productive. On the other hand, defendants allege that, in respect to certain items, Smoot's forces were more productive during the delay period than at periods before the accident. On direct examination, the witness Brower, explained his calculations with respect to the loss of labor productivity.

■ Mr. Brower's testimony and illustrations concerning the impact of the collapse on morale, coupled with the testimony of Smoot's President, persuasively established that Smoot's claim is well founded. Among the examples cited by Mr. Brower are items referred to as "non-critical" work. The defendants' argument that productivity increased after the collapse is, on the other hand, easily dismissed. Smoot has presented sufficient evidence to show that the collapse of the steel frame directly and significantly contributed to its productivity loss totaling $19,604.

(26) **Unabsorbed home office overhead**

---

1. *W.G. Cornell Co. v. Ceramic Coating Co.,* 626 F.2d 990, 993 (D.C.Cir.1980) *citing* 5 A. Corbin, Contracts § 1020 (1964); Restatement of Contracts § 331 (1932).

Home office managerial operation is necessary to support the construction operations in the field. It is allocated to every construction project via use of the *Eichleay* formula.[2] Brower described the formula as "an allocation of home office overhead to different projects, and in a delay situation we always rely upon the *Eichleay* formula for the quantification of extra home office overhead that, essentially is unabsorbed because of delay." Tr. January 24, 1989, vol. II at 103.

■ Although some courts have determined that a contractual delay does not immediately entitle a contractor to recover home office overhead costs,[3] if the delay is such that the contractor can neither reduce home office overhead costs nor take on new work to absorb these costs, the contractor will inevitably suffer losses of this kind.[4] The contractor must show that actual damage was necessarily suffered because the nature of the delay made it impractical "to undertake the performance of other work," *Cornell*, 626 F.2d at 994, or to reduce its home office personnel or facilities. Generally, this requirement is met by showing that the delay was sudden and of unpredictable duration.

Defendants argued that Smoot did not and cannot meet the above standard. This Court finds, however, that even if other work had been available, it would have been impractical for Smoot to undertake it, because the delay due to the steel collapse was unexpected and of unpredictable duration.

It was not foreseeable how long this delay of a critical path item, one impacting the entire project, would last. Defendant tries to minimize the delay by arguing that work on the project was only "suspended" for eight days—two of which were due to rain. Although defendant admitted that its failure to follow safety standards directly caused the collapse, it nonetheless refuses to acknowledge and take responsibility for the resulting delay. Certainly, it is evident from the facts presented that the steel erection was on the critical path, and that the Project was consequentially delayed though for a short period only.

Defendants also allege that Smoot never reduced its manpower, noting that two weeks after the accident the same activities were being conducted with approximately the same manpower levels. Even if this were true, for Smoot to cut back on its manpower at a time when it is trying to recover or make up for the delay caused by defendants would significantly defeat its purpose. However, Brower testified to the contrary—that following the collapse the work force had in fact decreased. The *Eichleay* formula is well accepted in similar cases by our Circuit, this Court finds that the plaintiff is entitled to $109,911 in claims for unabsorbed home office overhead.

(27) **Unabsorbed field office overhead**

This claim pertains to Smoot's costs for remaining on the site beyond the time the Project would have been completed. But for the delay caused by defendants' negligent construction, Smoot would have finished the Project on schedule and moved on to another project. Therefore the costs for remaining on the site are compensable. This includes the required on-site management, temporary electricity, telephones, trailer, clean-up, and other regular construction project needs.

Defendants argue that if the delay alleged to have been caused by the accident were not concurrent with other delays, the theory underlying this element of damage would be sound, and this would be an appropriate recovery. Since the delay was not concurrent with any others, defendants were solely responsible and liable to Smoot

---

**2.** The formula was established in *Eichleay Corp.,* 60–2 B.C.A. (CCH) ¶ 2688 (1960), aff'd on reconsideration, 61–1 B.C.A. (CCH) ¶ 2894 (1961).

**3.** *See Cornell,* 626 F.2d at 994 (D.C.Cir.1980); *Massman Construction Co. v. Tennessee Valley Authority,* 769 F.2d 1114, 1125 (6th Cir.1985),

*cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).

**4.** *George Hyman Const. v. Wash. Metro. Transit Auth.,* 259 U.S.App.D.C. 449, 816 F.2d 753, 756 (D.C.Cir.1987); *see also Capital Electric Co. v. United States,* 729 F.2d 743, 744 (Fed.Cir.1984).

for the delay. These costs of $74,463 are recoverable by plaintiff.

### (28) Extended equipment costs

■ Smoot argues that due to the delay it maintained certain inventory beyond the time frame established for the erection of the structural steel frame. Although the actual arrival and departure dates of each piece of equipment are not available, it argued that the level of inventory was closely reflected by the relevant inventory list. Smoot alleges that it is entitled to reimbursement for its continued ownership expenses—namely, depreciation, insurance, taxes and storage, relying on the proposition that it is required to prove only the fact of damage and to establish a reasonable estimate of them.[5]

This Court finds that although plaintiff is not required to prove with accuracy the amount of damages, it failed to establish a reasonable estimate for such items. Plaintiff omits a crucial element in its damage calculation for these items, namely when each piece of equipment arrived and left the site. Moreover, it is quite possible that these same items were used in some other aspect of the construction subsequent to the steel frame collapse. It is unclear from the evidence presented that these items were used solely for the purpose of the erection of the structural steel frame.

Therefore, this Court awards plaintiff the sum of $5,000 for reimbursement on these items.

### (29) Escalated cost of winter protection

■ Due to the delay caused by the steel frame collapse, Smoot was forced to extend some of its work into the winter months. This claim, therefore, includes all costs associated with protecting the structure during the 1985–86 winter months. Smoot argues that the excessive costs incurred are the product of the daily cost escalation and the delay to the conclusion of the enclosure of the building. Defendants, on the other hand, argue that Smoot resumed in less than two weeks after the collapse and furthermore, that enclosing the structure was dependent on the precast erection which could not have been completed before winter.

The evidence presented, persuasively shows that costs arising from protecting the structure are valid. The steel frame erection was a critical path item; therefore *any* degree of delay directly affected the Project's schedule. The Court finds that the accident resulted solely from defendants' action in the steel frame erection. Winter protection costs were associated with the collapse.

As discussed earlier, the steel frame had to be erected before the exterior precast panels. Certainly, the delay caused by the collapse impacted the schedule for the entire Project, and delayed the erection of the precast panels—the second item on the critical path. Therefore, the precast erection was dependent on Williams completion of erecting the steel frame. The collapse caused a delay in the erection of both the steel frame and the precast panels, and it caused Smoot to spend more money than initially allocated to winter protection to compensate for the delay in the erection of the exterior precast panels. In fact, if the erection of the precast panels had been on schedule, this would have reduced the winter protection cost. The claim of the plaintiff in the amount of $2,888 is recognized as stated.

### (30) Labor escalation

■ This claim refers to the escalation in manhours and the elevated wages Smoot had to absorb for the time period subsequent to the collapse. On direct, Mr. Brower explained labor escalation as:

A. [L]abor escalation is not increased labor, it's not additional people, it's the escalation on the man hours, so if a man is making ten dollars an hour and he has to increase to eleven dollars an hour at some future point in time, if not for the delay ... he could have been doing certain work at ten dollars an hour as opposed to eleven dollars an hour, so therefore that's a one-dollar increase per man hour that this guy had to put in at a later period of time, when, if not for the delay,

---

5. *Cornell,* 626 F.2d at 993 (D.C.Cir.1980).

he should have been able to put it in earlier, prior to the increase in the hourly wage. Tr. January 24, 1989, vol. II at 102. Smoot argues that as of May 1, 1985, the unions of the various trade laborers had negotiated rate or reimbursement increases. Px. 10, vol. I at 36. It argues that the work performed in the first 83 calendar days after May 1, 1985 could have been performed earlier but for the delay due to the accident. Williams alleges that the only basis upon which an escalated wage rate claim can be calculated is for the period of time activity actually was stopped. It gives no authority for this claim.

Relying on the principle established in *Cornell,* plaintiff has succinctly proved damage and presented a reasonable estimate for the costs incurred. Since it has met the required standard, it is entitled to relief in the amount of $4,049.

**(31) Increase of insurance premium**

■ With regard to the insurance claim, Smoot presented testimony by Larry Kerr, an insurance broker with the Carson Agency. He testified as to 12 years direct experience in handling Smoot's account and some 10 prior years experience as an underwriter. Mr. Kerr was the Executive Vice President of the Carson Agency which carried 20 employees.

He testified from personal knowledge with the Smoot account that Smoot had carried its insurance for some 40 years with Continental Insurance Co. ("Continental"). He indicated that the market had tightened and rates increased as a result of the liability insurance crisis in the year 1984–85. The impact of the Coolidge accident was not recorded in underwriting data until 1985 and that it was the principal cause for the effective termination of insurance by Continental at the end of calendar year 1985. This termination ended a 40–year relationship between Continental and Smoot. Forced to enter into a tight market and obtain coverage on short notice in 1985, Kerr testified that as a result of the accident, Smoot was required to pay $45,000 additional for similar insurance coverage in 1986, notwithstanding a substantial drop in payroll from $5.8 million in 1985 to $3.7 million in 1986. He also testified that such an increase would continue to have a similar impact on Smoot's insurance costs for at least 3 years.

Defendants' insurance expert, Mr. John Hughes, was currently working with the Construction Insurance Agency in Falls Church, Virginia, which was an affiliate of defendant Williams Enterprises, Inc. He had no first-hand knowledge about the Smoot account and the insurance that Smoot had with Continental and the raising of their insurance rates following the steel collapse in 1984. Nor did he have any insurance with Continental at any time during his insurance career. Nor did he have any type of prior contact with Continental during his long career. He was in Court when Larry Kerr testified for Smoot but he offered no serious rebuttal to Kerr's testimony. He had previously only been accepted once as an expert witness; that was for defendant Williams Enterprises, Inc. in a state court proceeding.

This Court concludes that considering the testimony of the two expert witnesses and given the increased costs shown and the loss of a valuable insurance relationship, Smoot is entitled to $135,000 ($45,000 insurance payments per year for three years).

**(32) Claims of attorneys fees and expert witnesses**

The subcontract between Smoot and Strait provided in two independent paragraphs for payment of attorneys' fees. Section 20 provided that in the event of a suit by either party to the subcontract "the prevailing party shall be entitled to recover a reasonable attorneys' fee in addition to any other relief granted by the court." Also, Section 11 provided that the subcontractor would indemnify Smoot against "any liability on account of any act or omission of the subcontractor, or any of his ... agents...." In this section subcontractor agreed to "indemnify the contractor and the owner against and save them harmless from *any and all loss, damage, costs, expenses, and attorneys' fees suffered or incurred on account of any*

*breach of the aforesaid obligations ... and any other provision or covenant of this subcontract."* As of February 1, 1989, President Smoot had incurred attorneys' fees in the amount of approximately $113,000. He is entitled to those full costs.

Smoot has further incurred expenses for expert studies and for attendance at trial totalling $25,560.92. Testimony and regular vouchers have been offered as to payments to those experts. President Smoot is also entitled to these amounts under Section 11.

In sum, the Sherman E. Smoot Company is due the sum of the items identified in the above paragraphs for a total of $138,561 from Williams Enterprises, Inc. and Strait Manufacturing and Welding Inc.

### (33) Claim for damages to business reputation

As to Smoot's claim for damages to business reputation, an expert of the defendants noted that the accident had been featured prominently in the Washington, D.C. media. The Court also recalls that such coverage was carried in the local press.

President Smoot testified that while damage to reputation was not likely to affect the company's ability to win public bidding jobs based on lowest responsive bidder, it could substantially impact Smoot's ability to obtain construction management work, a significant area of the company's activity. He also testified that the company had been unable to win such awards in the Washington, D.C. area after receiving a joint venture award to build the Union Station renovation project prior to the Coolidge collapse. Smoot further produced a certified statement showing an average annual expenditure of about $40,000 on advertising and charitable contributions made to maintain the good name of the company.

Based on the limited testimony of Mr. Smoot, the Court denies the request for damage to reputation. His testimony lacked specificity as to any proof which could be directly attributable to loss of reputation arising from the accident. In the absence of such specificity and preciseness, the Court declines to speculate and award such damages.

### CONCLUSIONS OF LAW

(1) The December 15, 1983 contract between Strait and Smoot was entered into in the District and provided for construction activities to be conducted in this jurisdiction. Construction of the contract and legal actions of all the parties including Williams are governed by the laws of the District. There is no dispute that the subcontracts are valid and binding.

The separate but related claim by Smoot against Williams for negligent conduct of its work (there being no privity of contract between the two) is similarly governed by the law of the District of Columbia.

(2) Section 1 of the subcontract specifically incorporates by reference the "prime contract" between Smoot and the District including "all the general and special conditions, drawings, specifications, addenda, amendments, modifications and all other documents forming or by reference made a part of the contract between the contractor and owner." These addenda include the Project CPMs submitted pursuant to Special Stipulation which as of the date of inception of steel erection permitted 45 work days for that activity.

(3) Section 6 of the subcontract specifically provides that the subcontractor will prosecute the work efficiently and promptly; further, that subcontractor agrees to pay to the Contractor such other or additional damages as the Contractor may sustain by reason of delay by the Subcontractor. This provision is an express statement of the generally recognized common law obligation of parties not to hinder or interfere with one another's performance. *Fuller Co. v. United States*, 69 F.Supp. 409, 411, 108 Ct.Cl. 70 (1947); *see also, United States ex rel. Heller Electric Co. v. Klingensmith, Inc.*, 216 U.S.App.D.C. 408, 670 F.2d 1227 (D.C.Cir.1982); *Luria Brothers v. United States*, 369 F.2d 701, 708, 177 Ct.Cl. 676 (1966).

(4) In an action between private parties, it suffices to show that a subcontractor caused a substantial delay in performance,

that the contract terms forbade such a delay, and that the plaintiff was injured as a result. *United States ex rel. Gray–Bar Electric Co. v. J.H. Copeland & Sons,* 568 F.2d 1159, 1160 (5th Cir.1978); *District Concrete Co. v. Bernstein Concrete,* 418 A.2d 1030, 1038 (D.C.1980). Smoot has proved each of these elements.

(5) The steel erection activity was an activity on the critical path of the Project. By definition, a delay to a critical path activity will result in a delay to the entire project resulting in compensable costs. Stephen M. Siegfried, *Introduction to Construction Law,* Chapter 12, page 243 (ALI–ABA, 1987); Bramble and Callahan, *Construction Delay Claims* (John Wiley & Sons 1987), pp. 9–10, p. 145.

(6) Smoot may properly commit its resources and those of its subcontractors to its projected CPM completion date—even if that date is earlier than the final date required by the contract with the owner—and may recover damages from a subcontractor which causes delay. *District Concrete Co. v. Bernstein,* 418 A.2d 1030, 1038 (D.C. 1980); *Grow Construction Co. v. State,* 56 A.D.2d 95, 391 N.Y.S.2d 726, 728 (1977); *Canon Construction Co.,* ASBCA 16142, 72–1 BCA § 9404 (1972).

(7) Independently of the breach of contract claim against Strait, Williams bears independent legal responsibility for negligent acts on the job. Williams has not disputed this element of the claim. *Graves v. United States,* 517 F.Supp. 95 (D.D.C. 1981).

(8) Defendants have not alleged or proved that Smoot or any other party impeded their performance of the steel erection activity. Instead, they have alleged that delays by the District or others exculpated them from liability for delay caused by the collapse. These allegations are affirmative defenses.

(9) In a diversity case such as this, the issue of burden of proof on any particular matter is a substantive question which is controlled by state law. *Cities Service Oil Co. v. Dunlap,* 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939); *Eastern Airlines v.* *McDonnell Douglas Corp.,* 532 F.2d 957, 990 at footnote 92 (5th Cir.1976).

(10) Defenses relating to excuses for breach of contract or other defenses tending to exculpate defendants from liability are affirmative defenses. Defendants have the burden of proof of claim in the District. *Tendler v. Jaffe,* 203 F.2d 14, 18 (1953); *see also Eastern Airlines,* 532 F.2d 957 at footnote 92 (5th Cir.1976). Defendants have failed to meet that burden.

(11) Case law cited by defendants relating to concurrent delay and apportionment could become applicable only if concurrent delay had been determined as a finding of fact. This Court made no such finding. On the contrary, Smoot has proved a clearly identified delay of 83 days caused by defendants.

(12) Cases cited by defendants such as *Blinderman Construction v. U.S.,* 695 F.2d 552 (Fed.Cir.1982) and *Commerce International Co. v. U.S.,* 338 F.2d 81, 167 Ct.Cl. 529 (1964) are government contract cases involving construction of particular government contract clauses, not present in this matter. But, in any event, these cases relate to factual findings that plaintiff had contributed in some measure to the particular delay charged to defendants. No such findings have been made in this case. Defendants have been found *solely* responsible for 83 calendar days of delay, not delays before or after its activity on the project. The Project was completed much more than 83 days late, but these independent delays are in no way attributed to defendants.

(13) Even if, contrary to the finding in this case, other causes had made some contribution to the particular delay charged, defendants would remain liable because Smoot has proved that the action of defendants was a "substantial factor" in causing injury to plaintiff. 5 *Corbin on Contracts* 999 (1964); *Tuttle/White Constructors, Inc. v. Montgomery Elevator Company,* 385 So.2d 98, 101 (Fla.App.1980); *American Sanitary Sales v. State of New Jersey,* 178 N.J.Super. 429, 429 A.2d 403 (App.Div. 1981).

**24**

(14) This Court concludes by a fair preponderance of testimony and evidence that Williams Enterprises, Inc. and Strait Manufacturing and Welding, Inc. have failed in their joint effort to show that the steel collapse and resulting damages was in any way caused by the actions of the Sherman E. Smoot Co. The claims of Williams Enterprises, Inc. and Strait Manufacturing and Welding, Inc. against the Sherman E. Smoot Co. be and they are **denied and dismissed.** Williams and Strait failed to produce adequate and sufficient testimony and evidence that Smoot was the proximate cause for any type of delay damages resulting from the steel collapse of September 25, 1984.

(15) The Court concludes that the plaintiff Smoot is entitled to receive the sum of $493,030 in accordance with the findings of fact above in Section E.

(16) Added to this plaintiff Smoot is entitled, in the interest of justice to ensure adequate compensation for damages, to the cost of capital. The cost of capital shall be based on the sum of $493,030 in accordance with the findings of fact set forth above. This cost shall run from the time of the steel collapse, September 25, 1984 up to and including the final trial day of this case, February 1, 1989; costs are not from the time of the entry of the present judgment. This award shall be consistent with D.C.Code § 15–109 (1973 Ed.) and with the applicable federal statutes and regulations. *Blake Const. Co. v. C.J. Coakley Co., Inc.,* 431 A.2d 569, 580 (D.C.1989); *District of Columbia v. Pierce Assoc.,* 527 A.2d 306, 310 (D.C.1987); *House of Wines, Inc. v. Sumter,* 510 A.2d 492, 499 (D.C.1986); *Edmund J. Flynn Co. v. La Vay,* 431 A.2d 543, 550 n. 6 (D.C.1981).